IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, | ) ) ) C.A. No. 6:08-3249-HMH-BHH ) |
| Plaintiff, | ) ) **OPINION & ORDER** |
| vs. | ) ) |
| Cromer Food Services, Inc., | ) ) |
| Defendant. | ) |

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Bruce Howe Hendricks, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1] Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), acting on behalf of Homer Howard ("Howard"), alleges causes of action for hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Defendant Cromer Food Services, Inc. ("CFS") filed a motion for summary judgment on July 10, 2009. After review, the court grants CFS's motion for summary judgment.

---

[1] The magistrate judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. See 28 U.S.C. § 636(b)(1)(2006).

1

## I. Factual and Procedural History

CFS is a "provider of industrial food services whose primary business is selling food and beverages through vending machines placed on [various] customers' premises." (Pl. Mem. Opp'n Summ. J. 2.) C.T. Cromer ("CT") is the owner of CFS. (Id.) Howard began working for CFS as a vending route salesperson in July 2006. (Id.) Howard worked second shift Monday through Friday, 3:00 p.m. to 11:00 p.m. (Id.) "Howard's vending route mainly involved restocking [CFS's] vending machines at Greenville Memorial Hospital [("GMH")]." (Id.) "Howard would start by restocking the vending machines in the canteen located in the main lobby and then work his way up the different floors of the hospital according to a schedule set by [CFS.]" (Pl. Mem. Opp'n Summ. J. 3.)

During his time of employment with CFS, Howard alleges that he was sexually harassed by two male employees of GMH, John Mills ("Mills") and Andre McDowell ("McDowell"). (Id.) Mills and McDowell are housekeeping crew leaders at GMH. (Id.) Howard saw Mills and McDowell each day that he went to GMH to restock vending machines. (Id. at 4.) Howard alleges that the harassment allegedly began on or around December 4, 2006. (Id. at 3.) Howard contends "[t]he harassment by Mills and McDowell continued for approximately four months. The harassment consisted of sexual comments, sexual advances, and touching." (Pl. Mem. Opp'n Summ. J. 4.) "If Howard was running late, Mills or McDowell would comment about Howard being late and say they were 'worried about' him. Howard was bothered by the fact [that] Mills and McDowell were so familiar with his schedule. [He] felt like they were stalking him." (Id.) Howard also found it difficult to remove himself from the harassment because

"[w]hen Mills and McDowell approached [him] . . . he was restocking the vending machines, [so he] was forced to stay in place because the vending machine was open." (Id.)

Howard alleges that "Mills and McDowell constantly made sexual comments to [him]" and the comments were made "every day." (Id.) Mills would often "follow Howard, whistle at him and make comments like 'you've got a nice walk.'" (Id. at 5.) Mills would also talk to Howard about giving and receiving oral sex from men and "would often touch or fondle himself" while speaking to Howard. (Pl. Mem. Opp'n Summ. J. 5.) "On February 13, 2007, Howard was at the [GMH's] gift shop purchasing a gift for his wife [when] Mills came up behind Howard, put his arms around [him] and said 'Oh Homer, I didn't know you loved me that much. You're buying me a Valentine's gift?'" (Id.)[2]

Howard alleges that he first reported the sexual harassment by Mills and McDowell to CFS's plant manager, Greg Adams ("Adams") on or around December 5, 2006. (Id. at 6-7.) Adams "laughed and told Howard 'it was just a joke' and 'let it go'" and "it's only guys goofing around." (Id.) Adams states that Howard complained to him about GMH employees making vulgar statements and sexual advances toward him but he did not perceive that to be a complaint about sexual harassment. (Id. Ex. 3 (Adams Dep. (22-23).) On or around December 8, 2006, Howard complained about the harassment to his direct supervisor, Brian Tyner ("Tyner"). (Pl. Mem. Opp'n Summ. J. at 7.) According to Howard, Tyner told him "it was just a joke not to take things serious." (Id.) "Around the end of December 2006, Howard complained to Chet

---

[2] Much of the explicit language quoted in the Report and Recommendation of the magistrate judge was stated by Howard at his deposition. However, as discussed more fully below, Howard did not provide such explicit details and examples when discussing the matter with his superiors at CFS. (Def. Mem. Supp. Summ. J. Ex. C (Howard Dep. 124-25).)

3

Cromer [("Chet")], [CFS's] Senior Vice President. Chet said he would call" C.T. about the harassment. (Id.) "Howard complained to C.T. . . . sometime in January and told him that the harassment by the hospital employees was getting worse." (Id. at 8.) Howard alleges that C.T.'s response to his complaints was, "I'm not responsible for the hospital. I'm only responsible for CFS." (Id.) "Howard [allegedly] met with C.T. at least two more times about the sexual harassment." (Pl. Mem. Opp'n Summ. J. 8.) C.T. alleges that he first learned of the harassment in March 2007. (Id. Ex. 1 (C.T. Dep. 121-22).)

Howard also reported the harassment to Ronnie Galloway, operations manager at GMH, and Pat Leach ("Leach"), GMH's manager of environmental services. (Id. at 10.) "The harassment stopped for about two days, but then continued." (Id.) Howard alleges that the "sexual harassment had an emotional impact" on him, he "lost weight, could not sleep, and was unable to eat." (Id. at 6.) The harassment also "affected Howard's social life and his marriage." (Pl. Mem. Opp'n Summ. J. 6.)

On March 6, 2007, Howard filed a charge of discrimination against CFS with the EEOC. (Id. at 10.) "On March 23, 2007, Howard reported to work and . . . Adams told him not to clock in because C.T. . . . wanted to see him. During the meeting, [C.T.] handed Howard a memorandum notifying [him] that he was being assigned to a first-shift driver route effective immediately." (Id. at 10-11.) According to the memorandum, CFS had "only one 2nd shift position servicing vending machines" therefore Howard was being "offered a 1st shift position beginning Monday March 26, 2007." (Def. Mem. Summ. J. Ex. D (Job Offer Letter).) C.T. concedes that CFS received paperwork explaining that Howard had filed a charge of discrimination with the EEOC prior to his meeting with Howard on March 23, 2009. (Pl. Mem.

4

Opp'n Summ. J. Ex. 1 (C.T. Dep. 148-49).) Howard alleges that on March 22, 2007, C.T. "told [him] that he 'got his stupid letter' from EEOC." (Id. at 12.) Howard also contends that he "was aware of another second shift route driver position where the driver had quit." (Id. at 11.) C.T. alleges, however, that the first-shift position was all that was available to Howard. (Id. Ex. 1 (C.T. Dep. 149).) Howard alleges that he was "unavailable" to work the first shift. (Id. Ex. 2 (Homer Dep. 76).) Consequently, Howard quit his job shortly after the March 23, 2007 meeting.

The EEOC filed a complaint against CFS on September 24, 2008. CFS filed a motion for summary judgment on July 10, 2009. On July 28, 2009, the EEOC filed a memorandum in opposition to CFS's motion for summary judgment. On January 6, 2010, Magistrate Judge Hendricks submitted a Report and Recommendation recommending that the court deny CFS's motion for summary judgment. (Report and Recommendation 20.) CFS filed objections to the Report and Recommendation on January 25, 2010. The EEOC filed a reply to the objections on February 11, 2010. The court held a hearing on February 23, 2010.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### B. Objections

CFS filed objections to the Report and Recommendation. Objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

CFS filed two specific objections to the magistrate judge's Report and Recommendation. CFS alleges that the magistrate judge erred (1) "in finding that Plaintiff has stated [a] claim of imputed liability . . . based on the alleged sexual harassment of [Howard] by two employees of [GMH]," and (2) "in finding that Plaintiff has stated a *prima facie* case of retaliation because

Plaintiff has not and cannot show any adverse employment action was taken against Howard." (Objections 1-2.)

### 1. Hostile Work Environment Claim

First, CFS objects to the magistrate judge's conclusion that the EEOC has stated a claim for hostile work environment. (Id. at 1-5.) To survive summary judgment on a hostile work environment claim, a plaintiff must demonstrate that (1) the alleged harassment was unwelcome, (2) based on his sex, (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and (4) "there is some basis for imposing liability on [the Defendant.]" See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001) (internal quotation marks omitted). CFS asserts that it "had no authority or control over [GMH] employees Mills and McDowell, the purported harassers. [It] could not fire, suspend, counsel, or discipline Mills or McDowell in any fashion." (Def. Mem. Supp. Summ. J. 2.) Accordingly, CFS argues that there is no basis for imputing liability for Mills and McDowell's actions to CFS.

It is undisputed that Mills and McDowell are not CFS employees, rather they are employees of GMH, a customer of CFS. However, according to EEOC Guidelines, "[a]n employer may . . . be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e).[3] "While the EEOC Guidelines are

---

[3] While § 1604.11(e) references "sexual harassment of employees in the workplace," this provision has been read to extend outside of the workplace where an employee's job duties are performed away from the employer's premises. See E.E.O.C. v. Fed. Exp. Corp., No. C94-790C, 1995 WL 569446, at *3 (W.D. Wash. Aug. 8, 1995) (unpublished) ("FedEx cannot escape the dictates of Title VII on the fortuitous ground that its employees are couriers whose

intra-agency guidelines not binding on federal courts, they are nevertheless entitled to deference in the courts." Magnuson v. Peak Technical Servs., Inc., 808 F. Supp. 500, 512-13 (E.D. Va. 1992). "The courts have, in fact, recognized and adopted the EEOC Guidelines, or portions thereof, in several sexual harassment cases." Id. at 513 n.8.

Nevertheless, the United States Court of Appeals for the Fourth Circuit has yet to address the application of § 1604.11(e) in the context of an employer's liability for sexual harassment by a non-employee. Other courts, however, have consistently cited § 1604.11(e) for the proposition that "an employer may be responsible for sexual harassment based upon the acts of nonemployees." Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001); Lapka v. Chertoff, 517 F.3d 974, 984 n.2 (7th Cir. 2008) ("Employer liability can be imposed when the harassment is committed by . . . third parties."); Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 n.2 (11th Cir. 2003) ("An employer may be found liable for the harassing conduct of its customers . . . ."); Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir. 2002) ("In this circuit, employers [may be held] liable for harassing conduct by non-employees . . . . The [EEOC] Guidelines endorse this approach.").

In determining whether an employer is liable for the harassment by non-employees, courts ask "whether the [employer] fail[ed] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." Turnbull, 255 F.3d at 1244 (internal quotation marks omitted). "The focus is not on the conduct itself but on the employer's behavior in response." Id. In essence, the courts apply a negligence analysis which is "divided into two separate inquiries, looking first,

---

duties take them onto the premises of FedEx customers.")

into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." Id. (internal quotation marks omitted). "Even if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to end the harassment." Guthrie v. Baker, 583 F. Supp. 2d 668, 678 (W.D. Penn. 2008).

The negligence analysis set forth by courts that have applied § 1604.11(e) to cases involving sexual harassment by non-employees is similar to the standard the Fourth Circuit applies in cases of sexual harassment by a coworker. See Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006) ("In order to determine whether the Navy was entitled to summary judgment, we must determine when the Navy had actual or constructive notice of McCall's alleged harassing behavior and whether the Navy's response was reasonable once such notice was provided."). As such, the court finds that CFS may be held liable for the actions of non-employees Mills and McDowell only if, after having actual or constructive knowledge, it failed to provide an adequate remedy to the alleged harassment. The court, however, finds that CFS provided an adequate remedy in offering Howard a transfer to the first-shift position.

While it is undisputed that a number of Howard's superiors at CFS were aware of the alleged harassment by GMH employees, there is a factual dispute regarding *when* Howard's superiors were made aware of the severity of the harassment. Nevertheless, the court finds that this is not a material dispute. Upon viewing the facts in the light most favorable to the EEOC, the court finds that CFS provided a remedy after becoming aware of the severity of the harassment. The EEOC alleges that Howard reported the harassment to Adams, CFS's plant

manager, in December 2006. During his deposition, however, Howard stated that when he spoke with Adams he did not provide any examples of the type of behavior that offended him:

> Q: Did you tell anyone at CFS *the extent of the harassment*? What actually was happening? Or did you just tell them, "I'm being sexually harassed"?
>
> A: I reported to Greg Adams and I told him that "There is some gentlemen at the hospital that's really getting vulgar, getting very obnoxious. They're always talking about sex." And, again, the only reply I got was a laugh. "Oh, Homer, they're only joking." And that's as far as the conversation got.
>
> Q: Did you ever give Greg or anyone else any examples of what was happening and why you felt it went beyond joking?
>
> A: I don't understand what you mean by example.
>
> Q: Like you've been doing here today, *telling specifically what they did*?
>
> A: No.
>
> Q: Did you ever give them any more information so that they could know if it was joking or if it went beyond joking to the level of sexual harassment?
>
> A: No. I never . . . all I told them was I was being sexually harassed at a hospital.

(Def. Mem. Supp. Summ. J. Ex. C (Howard Dep. 124-25) (emphasis added).) Accordingly, Howard never provided any of the CFS employees with specific details of the purported sexual harassment.[4] Nevertheless, in March 2007, CFS was made aware of the severity of the harassment when Howard filed a charge with the EEOC. On March 23, 2007, CFS responded to Howard's allegations by offering him a transfer to a first-shift position.

---

[4] The court also notes that Howard alleges that he "complained to Mills' and McDowell's supervisor . . . that [they] were sexually harassing him . . . . The harassment stopped for about two days, but then continued." (Pl. Mem. Opp'n Summ. J. 10.) The EEOC contends that CFS should have complained to GMH about the alleged sexual harassment, however, GMH had already been notified about Howard's complaints yet the harassment continued.

CFS alleges that "the <u>only</u> corrective action available [to Howard] in light of the alleged sexual harassment . . . by non-employees [was] a proposed transfer of Howard to first-shift on the same terms and conditions of employment available to any other first-shift vending route salesperson." (Objections 1-2.) The EEOC does not dispute that the first-shift transfer would have prevented Howard from having any interaction with McDowell and Mills.[5] CFS may only be held liable if it "fail[ed] to remedy or prevent a hostile or offensive work environment." Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998) (quoting Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 (10th Cir. 1998)). "The [court's] focus is . . . on . . . the employer's behavior in response." Turnbull, 255 F.3d at 1244. After learning about the extent of the alleged harassment, CFS provided Howard with an alternative work assignment that remedied and prevented further sexual harassment from the GMH employees. Accordingly, the court finds that the EEOC has failed to show a genuine issue as to any material fact regarding the hostile work environment claim and grants CFS's motion for summary judgment as to the hostile work environment claim.

### 2. Retaliation Claim

Next, CFS objects that the magistrate judge erred "in finding that Plaintiff has stated a *prima facie* case of retaliation because Plaintiff has not and cannot show any adverse employment action was taken against Howard." (Objections 2.) The magistrate judge concluded that "genuine issues of fact remain as to the [EEOC's] retaliation claim such that dismissal is improvident." (Report and Recommendation 19.) CFS, however, argues that summary judgment

---

[5] The court will address the EEOC's allegation that this first-shift transfer was an adverse employment action under the retaliation claim discussion.

should be granted on the EEOC's retaliation claim because the EEOC cannot establish an adverse employment action taken against Howard. (Objections 5.)

Title VII's antiretaliation provision forbids employer actions that "discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a). In order to establish retaliation, the EEOC must show "(1) that [Howard] engaged in protected activity[6]; (2) that [CFS] took adverse employment action against h[im]; and (3) a causal connection existed between the protected activity and the adverse action." McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991). CFS argues that the EEOC cannot establish the second and third elements regarding an adverse employment action. (Objections 6.)

In order to establish an adverse employment action taken by an employer, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). This standard is "phrase[d] . . . in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id.

The EEOC alleges that CFS's "transfer of Howard to a different shift" was an adverse employment action in retaliation of Howard filing a charge of discrimination with the EEOC.

---

[6] The EEOC alleges that CFS retaliated against Howard after he "complained to [CFS and GMH] about sexual harassment and after Howard filed a discrimination charge with the [EEOC]." (Compl. ¶ 8.)

12

(Pl. Mem. Opp'n Summ. J. 24-25.) The EEOC contends that the transfer was an adverse employment action because

> Howard would have sustained a per hour decrease in wages and an increase in the number of hours he was required to work as a result of the transfer. C.T. . . . gave Howard an ultimatum, telling him "Either you take [the transfer] or you're done." Howard told C.T. . . . he could not take the shift [because] he has young children, one of whom had a medical condition, and Howard needed to be available to transport the child during the day.

(Id. at 25.) Prior to offering Howard the first-shift position, Howard had told C.T. "that he could only work second shift." (Id. at Ex. 1 (C.T. Dep. 93).) Accordingly, the EEOC argues that CFS's actions presented Howard with no other option than to resign. (Id. at 25.)

The EEOC also alleges that there is a "causal link between [Howard's] protected activity and the adverse employment action." (Id. at 26.) The EEOC alleges that C.T. "received a copy of Howard's EEOC Charge and the Notice of Charge no more than one week prior to his meeting with Howard on March 22, 2009." (Pl. Mem. Opp'n Summ. J. 27.) C.T. concedes that "some paperwork [was] sent to us" regarding Howard's EEOC charge prior to the March 23, 2009 meeting. (Id. Ex. 1 (C.T. Dep. 149).) Additionally, after learning about the EEOC charge, C.T. asked Howard, "What is your complaint? I mean, what is your grievance? What did I not do you were not happy with?" (Id. Ex. 1 (C.T. Dep. 164).) Moreover, according to C.T., he received the paperwork regarding Howard's EEOC charge "within a few days or a week" of offering Howard the first-shift position. (Id. Ex. 1 (C.T. Dep. 165).)

CFS argues that the offer to transfer to the first shift was not an adverse employment action, rather it was the only option available to cure Howard's complaints of sexual harassment. (Objections 6.) As discussed above, CFS asserts that the "only *reasonable* way in which [it]

13

could end the alleged harassment of Howard by non-employees at [GMH] was to move Howard to first-shift." (Id.) The EEOC alleges that Howard "could not take the shift . . . because he has young children, one of whom had a medical condition, and Howard needed to be available to transport the child during the day." (Pl. Mem. Opp'n Summ. J. 25.) "The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004). "A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Id. (internal quotation marks omitted). While the first shift would require an increase in the number of hours Howard would work each week, it also offered more pay. (Def. Mem. Supp. Summ. J. 10.) "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Id.

The first-shift position would have required Howard to work from 4:00 a.m. until 3:30 p.m. Howard has provided the court with no evidence that he could not transport his child to necessary doctor appointments in the afternoon following the first shift. At oral argument, the EEOC conceded that, as it relates to Howard's family situation, the only drawback to the first-shift position was that it might interfere with his ability to take his child to the doctor. Howard's wife is a stay-at-home mother who does not drive. There is no evidence that Howard would be unable to schedule a doctor's appointment for his child after Howard's shift ended at 3:30 p.m. Moreover, Howard has failed to present evidence that he would be unable to leave work if an emergency arose. Additionally, according to the evidence presented during the hearing on the

motion, Howard was less than four months away from being eligible to receive leave benefits from CFS which would accommodate his need to leave work to transport his children if necessary. Accordingly, the EEOC has failed to establish that the transfer to first shift was an adverse employment action and that it was taken in retaliation for Howard filing an EEOC charge. As such, the court grants CFS's motion for summary judgment as to the retaliation claim.

As to both claims, the hostile work environment and retaliation claims, the determining factor is the same–whether CFS provided an adequate remedy to the hostile or offensive work environment. The superiors of the offending third parties were made aware of the harassment, yet the conduct continued. According to Howard, CFS was aware that he complained to GMH about the harassment. At that time, when the transfer was offered, CFS was in a "catch-22" position. CFS could have additionally contacted GMH to try and stop the offensive conduct. However, given that the conduct continued after GMH was notified about the harassment by Howard, the only definitive cure for CFS was to offer the first-shift transfer. If, hypothetically, the harassment continued after CFS had contacted GMH, Howard could have quit his job and complained that CFS constructively discharged him for failing to provide him an alternative work assignment.

Based on the foregoing, the court grants CFS's motion for summary judgment.

Therefore, it is

**ORDERED** that CFS's motion for summary judgment, docket number 47, is granted.

**IT IS SO ORDERED**.

                                                        s/Henry M. Herlong, Jr.
                                                        Senior United States District Judge

Greenville, South Carolina
February 26, 2010